May it please the court. Trooper Mullinex is entitled to qualified immunity in this case because there was no clearly established law that would have put him on notice that his conduct was a violation of the law. What about Lytles or Littles or however it's pronounced? The Lytle case is easily distinguishable, Your Honor, because there was a fact dispute in that case, and it is very distinguishable from this case. There was a minor traffic violation prior to the high speed pursuit, and the high speed pursuit went for a quarter to a half a mile at the most. It was a 30 second to a 45 second pursuit. When the suspect crashed, the officer was right behind him and parked momentarily. The suspect backed up momentarily and then proceeded forward, and that's where the fact dispute begins and ends because there's a fact dispute as to whether the shots were fired as the car moved away from the officer. Some of the evidence showed that the suspect was three to four houses away when he was shot. If that was the case, the court said that the threat to the officer had passed. It was moving away from him. Well, here there's no threat to your client at all. I mean, he's up there on the overpass. That's true, Your Honor. So the question is whether there's a threat to the guy who was laying out the spikes and whatever, but he didn't even know where that guy was. He, by opening fire, he very well could have hit the other officer. So he didn't have any idea who was being threatened when he just started shooting. Well, Your Honor, he knew that there was an officer below the bridge, and that's undisputed. Whom he could have hit by, you know, he fired six shots kind of randomly into the dark, and I mean, it seems to me he could have hit this very officer he's saying he wants to protect. But when we look to the lead authority in this case, which is the Brousseau case, the Supreme Court said that the officer, essentially said that the officer does not have to see the person he believes is in danger. And in the Brousseau case, the officer was firing at this Jeep as he was moving away, and the officer said because she feared for the officers who she believed were in the immediate area. And those officers were two houses down in the backyard. She didn't see them, couldn't see them. And the court said that that scenario, there was no clearly established law that precluded shooting under those circumstances. And we know that the Brousseau court, the Brousseau decision is still a valid law because just last week the Supreme Court held up Brousseau again and said it was basically the archetype for deadly force when using deadly force against a fleeing suspect. And the court said that, in fact, I'm sorry, Judge? Go ahead and finish. In Plumhoff, the court said that the officer was going to be entitled to qualified immunity unless the respondent could show that the officer's conduct was materially different from the Brousseau officer. And Brousseau, again, is where the officer didn't know where the officers were located. She just knew that they were in the area and were subject to, they were in danger by this suspect. And Trooper Molnick knew that the officer below him was going to be in danger by the suspect. And the danger in this case is even greater than in Plumhoff and in Brousseau because here we not only have the high-speed pursuit, there's a warrant out. He's been running for 16 to 18 minutes at over 100 miles an hour. And then he's called the dispatcher twice and said, I have a gun, and I'm going to shoot police officers. That raises the bar even higher than what we had in Plumhoff and Brousseau. So we have Brousseau here saying that you can use, that it's not clearly established that you can't use deadly force, even if you can't see the officer. And we have, then, the Plumhoff court saying, yeah, that's the standard. Isn't the summary judgment evidence here, isn't there some summary judgment evidence that was proffered by the plaintiff to the effect that the police chief or whoever was in charge, I forget the name, had thought that the best way to proceed to deal with this problem was to put out these spikes. Now, I'm not talking about what he said or didn't say to this officer. There's a professional judgment has been made that the best way to deal with this problem at the outset is to put the spikes out. Didn't the plaintiff offer some evidence along that line? Your Honor, he submitted an expert report that said that kind of thing, but this is an objective standard, and it's based upon what the officer is faced with at the very moment that he's having to make this decision. What do you do in a situation? Let's say that the police chief or whoever's in charge of this problem decides we're going to use a nonlethal, hopefully nonlethal, way to solve the problem first. That's what we're going to start out with. Okay. Now, let's posit, just for the sake of argument, not because I'm saying it's the facts here, that you have a rogue police officer who's hell-bent on shooting whoever this person is in the car. And the professional judgment is, let's sort of play this by ear, put the spikes out, and then you've got somebody who says, no, no, I'm here, I'll take care of it, bang. What do you do in that situation? I mean, what you have to look at, we're told to look at the facts here as the plaintiff portrayed them. We can't make fact, we've been accused on this court repeatedly, I might add, of making judgments, fact judgments about what happened. We have to take the facts and the light most favorable here to the nonmovement. Yes, Your Honor. So what, and as I understand it, the nonmovement here put forward evidence that these, that the chief or whoever made the decision we're going to go with less, we're going to start out with, you know, no lethal force. There's a couple things, Your Honor. The chief in this case didn't, I'm not sure, there was a sergeant who was called who was at home, and the sergeant said, you know, let the spikes, let's see if those spikes work. Now, the officer Who made the decision to put the spikes out? There were different agencies that decided that those decisions were being made but were made before the suspect called in and said, I'm going to shoot police officers. Now, first, to answer your question about what if there's a policy, well, the cases say that a violation of a department's policy is not the constitutional standard. So the only I'm not talking about a policy. I'm talking about an ad hoc decision. You know, we're going to try the spikes at the outset. It's up to the officer on the scene to make those kind of decisions. And one case that the SOCORT That's somewhat chaotic. I mean, there is a dispute about whether Mullenix knew what Sergeant Byrd had said because he said he turned his intercom off or whatever. But if he did know, are you saying that he's free to disregard that and just go commando and go out there and start shooting up a highway? No, Your Honor, I'm not saying that, but it is an objective standard and the officer's evil motives or bad intent aren't factored in at this stage. It's just based upon But what I'm saying is, I'm just looking objectively. The sergeant who's above him says, let's let the spikes work. And he decides not to follow that. For whatever reason, good, bad, or indifferent, I'm saying objectively, is that objectively reasonable to just decide on your own I'm going to start shooting randomly down the highway instead of following this order of the sergeant? No, I think this court needs to set the standard that the officer on the scene is the one who is to make the decision. Okay, well, I want to talk about the officer on the scene because what happened on the scene is Whatever there was about his decision to try to shoot out a car engine with a rifle, where all of these other law enforcement agencies apparently were involved, and one man decided that this was a good way to end the chase. I mean, is there any evidence that anyone else thought the way to end the chase was to try to shoot a rifle bullet into the car engine? Did anybody else agree with that at the time? No one else made that. Well, there's no evidence in the record about that, Your Honor. All right, and what we do know as well is whatever there was about his decision to do it, he was concerned enough about the prudence of it that he made a phone call to ask whether or not he should do it. Isn't that right? He did make the phone call because it's a life and death situation. He had never shot at a car before. He just wanted to try to make sure that he was Whatever the reason there. I'll concede to you, whatever the reason, he made a phone call to get a decision. We agree on that? Yes, Your Honor. And then do we agree further that he either didn't wait for the answer, didn't hear the answer? Because he now contends he never heard the response, which was, don't do that. Wasn't that the response? That was the response, but the evidence is undisputed that that officer who made that response said he was wrong because he completely misunderstood the facts, and he said that the officer on the scene, and that's in the record, that he testified that he thought from the dispatcher that this officer was behind the suspect and not that he was positioned on a bridge. He said once he knew all the facts, he agreed with what the officer said, and he also said DPS policy is that the officer on the scene gets to make those decisions, and this is the very reason because it's too hard to tell the man sitting at home in bed what's going on. Well, and I guess the other thing that's troubling about this is fortunately or unfortunately there are cases where an officer makes the decision to actually shoot the fleeing suspect, but he says his decision was to shoot out, to somehow disable the vehicle by shooting the engine. Now, other than a Bruce Willis movie, where does this come from? Your Honor, there's a case where they did exactly that, and that was the Cole v. Bone cases. They shot out the engine of the car. They tried to shoot out the engine of an 18-wheeler. They missed, and they hit the guy in the forehead. That decision was upheld in Eighth Circuit, and the Brousseau court looked at that case when it was trying to decide it was . . . So there's some police science somewhere that says I guess mechanically you can take a rifle and shoot into the engine of a car and disable the car. Is that . . . That's not what I'm saying, Justice Graves. You're saying somebody tried it before. I'm saying it's been tried before. But the cases say if you're able to use deadly force, you could . . . I mean he knew he was using deadly force. He needed to stop the threat before it got closer to Officer Ducheneau. I mean he had to make a split-second decision. This guy said he has a gun and he's going to shoot police officers. I know a police officer is below me and is putting out spikes. I know he has to get out of his car. I know the lay of the land. I know this car can drive off the road and run over him if you can't even shoot him. But it's a life-and-death situation. Does he wait and see if he's bluffing? And then if he shoots the officer, then he goes to the funeral and says, I'm sorry, but I wasn't sure where he was. I mean that can't be the standard that an officer has to see the suspect. And furthermore, even if that is the standard, it's never been held by any court that the officer has to see whether . . . How did it become a life-and-death situation? Because I know we have cases where we talk about the decision that the officer made in the moment. What was there about this moment that compelled the decision to fire those shots? The suspect said, I have a gun and I'm going to shoot any police officers I see. When did Mullenix learn that? He learned that when he was standing on top of the bridge, and it's in the record. It's on tapes that you can hear, and I've even . . . So this is before he turned his intercom off? Well, he didn't turn the intercom off, but that is . . . He turned something off so that he could not hear what Sergeant Byrd told him. Well, he got out of the car and the intercom was inside the car. Okay. He didn't turn on the outside intercom. Yes, and we know that because he actually radioed the officer below him and said, hey, this guy said he has a gun and he's going to shoot any police officer he sees, so be careful out there. He says that before he gets out of the car. That's when he's making this decision, and he's got that . . . this is that 90-second span of time when he's on top of the bridge trying to decide what he's going to do, and he has a limited amount of time because the car is coming toward him. And so he's got . . . in 90 seconds, he parks, he makes a phone call to the dispatcher, he makes a phone call to the officer below him. He gets out. He has to get the rifle out of the trunk. You know, you talk about he was the officer on the scene. Of course, there was another officer on the scene who was operating under instructions to put down the spikes, right? There were two officers on the scene, one who had been told, put down the spikes. Well, I don't believe Officer Ducheneau had been told to put down the spikes. He made the decision to put down the spikes, yes. Officer Ducheneau was below the bridge putting out the spikes. Well, somebody must have said something because he wasn't the only officer putting out spikes, so there must have been a communique. Right. The officers were all of the mindset to put out the spikes before the suspect started calling dispatch saying, I'm going to shoot police officers. That was a game changer. But you don't have any evidence that anybody else changed their mind about the methodology to employ to stop the chase? To a degree, I do, Your Honor, because Officer Trooper Mullenix told three different officers that he was going to get on the bridge and try to get a shot at this guy, and none of those three officers said, bad idea, let the spikes work. We have Officer Shipman, who's on the bridge standing right next to him. We have Officer Ducheneau that he's told below, and he's told him he's going to try to get a shot. We've told, and he told Officer, the trooper that was following the suspect, that he was going to get on the bridge and try to get a shot at this guy as well. None of those three officers. The question, that's right, but his chief did. All right. His chief said, maybe after he, there's a fact question whether he heard what the chief said. But the chief said, no, don't do that. Let's see if the spikes work. So, you know, we have to look at this evidence in the light most favorable to the plaintiff here, the non-moving party. So, it seems to me a lot of what you're saying does not look at the evidence in that light. And that's what we have to focus on. And you can give some attention to that on rebuttal. Thank you. Thank you. Okay, Mr. Hogan. Thank you, ma'am. Please support, counsel. I think it's clear what's really at stake in this case and what this case revolves around. And I see by the court's questions that the court is concerned with that, too. It's the lack of imminent danger. And that's what distinguishes this case from Plumhoff. And that's what makes the difference in this case. That's what made it unnecessary. But the problem with Plumhoff isn't just what kind of is the law, but what was clearly established. And so, I'm really struggling because I agree with Judge King. Tolan B. Cotton et al. has said very clearly, you guys need to be sure you're not deciding facts and whatever on summary judgment. But then you get Plumhoff, which says, you know, it's not clearly established that you can't stop a fleeing suspect with deadly force. So, where does this leave us? And I agree that at first blush it looks like there's cause for confusion. But Plumhoff was decided based on the freeze frame of what happened in 2004. Plumhoff says, let's look at the law of 2004 and see what was clearly established in 2004. And in Plumhoff, the court said, no, it wasn't clearly established. So, what clearly established it after 2004? Littles or Lytles or whatever? Two cases primarily. And this is interesting because Justice Alito in Plumhoff gave us a pathway to show the law is clearly established. He said that you've got to show two things. Either that the officer's conduct was different than in Brousseau, which I think we have here and we'll discuss more in a minute, or controlling authority that would have given the officer fair notice. And there are two primary cases in this court that would have given Officer Mullinex notice. And that's Lytle v. Sanchez. That was a 2009 opinion based on 2006 conduct. And also, I'm sorry, that was Lytle v. Bexar County. And Sanchez v. Fraley, which was a 2010 opinion based on 2007 conduct. And in both of those cases, the Fifth Circuit said that the law was clearly established in 2006 in Lytle, and the law was clearly established in 2007 in Sanchez, that you could not shoot someone absent an imminent threat to the officer or to civilians. All right. And what of Officer Mullinex's position that the imminent threat was to this Ducheneau, or however you pronounce it, the officer putting out the spikes? Officer Ducheneau was below the bridge. His video later showed that he was behind the pillars where his training told him to be. Okay. But, I mean, she's right that we have to look at what Mullinex knows. Mullinex knows Ducheneau is down there, and he knows that Lahia is on his way in his car going 80 to 100 miles an hour having threatened to shoot police officers. So while being behind, you know, off the road may protect you from the car, it doesn't necessarily protect you from a shot ricocheting, whatever, whatever. So that's our situation of split-second timing. How do we view that? And I think you hit on that, Judge Haynes, during the earlier argument when you said one of the things that Mullinex has got to be concerned about is the danger to Ducheneau that he is causing, not only from shooting six times but also from the fact that if he hits this vehicle, which he did, and the car goes out of control, which it did, it may roll over on Officer Ducheneau. But it boils down to the fact that Officer Mullinex did not have enough information to conclude that Officer Ducheneau was in danger. And that's part of the factual inferences that Toland says have to be indulged in favor of the plaintiff on summary judgment. That presents a fact question for the jury. But Officer Mullinex did not visually appreciate and see. You're saying that you think Officer Mullinex can still win, but it's in front of a jury on qualified immunity. So in other words, qualified immunity becomes a jury question because what did he know, what should he have known, what does an objective officer know, and all of that you're saying would go to the jury. That's right. Okay. That's right. Well, the problem, though, is whether something is clearly established is a legal question. And so I understand that there might be some facts here, exactly what Mullinex knew about where Ducheneau was and what Leahy had said and whether he heard Sergeant Byrd and all. I mean, I understand all that's factual. But if we read Plumhoff to say you can use deadly force to stop a fleeing suspect, here we have a guy that didn't just start fleeing. I mean, granted, he's on a stretch of highway, and I've been on that stretch of highway. I know it's a lonely road, but you're still going 8 to 100 miles an hour threatening police officers. You know, you're kind of putting yourself in danger there as the guy, as Leahy. And why isn't Mullinex free to think, well, we're not just dealing with the fact that this guy is a car on a highway, but that he's also claiming to be armed and dangerous? And that's why Plumhoff and Toland have to be read together. And they have to read that we do this two-step in making these decisions at this early stage where we indulge the facts in favor of the plaintiff, the non-movement in the case. And we have to assume that, for purposes of summary judgment, that Mullinex did not know. In fact, the record says he did not know where Deschanel was. But I'd like to turn to that conduct and what— It shows that he was aware of the fact that there wasn't any traffic on either side of the road at the time. He didn't see any cars on either side of the road. So it's not a matter—I mean, all of these cases that tell you what the law is emphasize the risk to civilians, other officers, et cetera. And if you go through his deposition, he does talk about some risk, but he negatives a lot of the risk that forms the centerpiece of these other cases. That's absolutely right. And Cordova, interesting thing about the Cordova opinion from 2009 in Colorado, that gives us some persuasive authority on factors to consider in making this balancing act, that we have to consider balancing the danger to civilians and other officers if we don't versus the threat of harm to the subject who's fleeing if we do. And we have some factors to guide us on that, the severity of the crime at issue, whether the suspect is an immediate threat to officers or others, whether the suspect is fleeing, and whether the officers have themselves contributed to the reckless conduct. Let me ask you this, because I think what possibly distinguishes this from some of the stuff you're saying is he has—it is undisputed, there's no question, as there was in Satolin, that he has made this threat. I'm going to shoot police officers. So doesn't that threat put Ducheneau in danger? If Leahy had a gun, the fact that he's driving—I don't think driving 80 miles an hour on I-27 is a particularly high-speed chase. I mean, that's an open stretch of road, whatever, whatever. It's a highway. It's not a school zone and so on. But that said, driving at 80 miles an hour with a gun and looking for a police officer to shoot, okay, that's very dangerous at that point. Is that the—there's no dispute about that fact, is there, that he was driving 80 miles an hour and he had threatened police officers? There's no dispute about the 80 miles an hour, and in West Texas we call that a prudent speed. But the issue about having the gun and threatening to shoot police officers, I don't believe that Mullinex should be entitled to rely on that for two reasons. One is that was communicated to a dispatcher over an unrecorded line. That was an unreliable threat. No one knew whether that was really Leha that was saying that or not. God forbid on the way out to the airport this afternoon, someone should call up New Orleans Police Department and claim to be me and say that they have a gun and they're going to shoot police officers. That's not enough to make a life-or-death decision over. Secondly, we have legal support for that. You have very little time to evaluate all of this. I mean, you do have the problem that we are trying to protect the lives of officers and so on and so forth, and explain to the widow at the funeral why you didn't credit this threat Leha made twice. So you're talking about split-second. You're talking about all of those things. That's what Plumhoff tells us. I'm really struggling with this because if you didn't have the threat, if you just have this guy driving 80 miles an hour down I-27, while that's over the speed limit, I agree, it's not way, way over it. It's not as crazy as some of these other chases that we've had, 100 miles in a residential neighborhood. But we've got this threat, and what do we do with that? And are we allowed to sit here and analyze it for hours and hours when this guy has 90 seconds to make up his mind or whatever it was? Unfortunately, we do have to analyze it somewhat in retrospect. This was not the type of split-second incident like many of these cases are. Mullinex had almost three minutes. He had two minutes and 45 seconds. From the time he stopped on the bridge to sit and wait and plan and discuss with Officer Shipman about whether this would work, maybe or not, he had almost three minutes. And as anyone who has worked in this court can attest, a lot can happen even in two minutes once the yellow light comes on. That can be a very long or a very short period of time, depending on which side you're on. But he had six minutes, and I believe I pointed out in the brief the six-minute figure. I wanted to clarify that to the court. He had six minutes from the time that that communication about the threat that Leha had called in to the dispatcher was communicated to him in the car on the radio as he's driving out to Cemetery Road from the time of that threat until the time that the shooting happened was six minutes. So this was a long period of time. He should have let the spikes work. Can I ask you back to the threat? Sure. You said it was this kind of unsubstantiated threat that just anybody could have called in. Was there anything to tell Mullinex that? Was there anything where Mullinex would have been put in doubt about the threat, where he was told some random person has called up and threatened and we don't know if it's the same guy or whatever? Or was he communicated that there is a suspect coming towards you who has threatened police officers? He was communicated that the dispatcher, and this was not his own dispatch, this was the police department in Tulia, had received a phone call and that the caller said that it was Leha and that the caller claimed to have a gun, that he was being pursued by police, and that he would shoot police officers. We later learned that that was false. It was just a bluff. There was no gun in the vehicle. But Leha was the one who made the call. He was bluffing when he said he was armed. But you're saying that Mullinex should have discredited this threat because it might have come from some random person. Was there any suggestion to Mullinex that this was not a threat that had meaning? Was there anything to suggest he wasn't armed or anything to suggest it wasn't Leha making the threat? That's my question. No, Judge Hanks, there wasn't. Does the record show whether whoever said, let's let the spikes see if they'll work, that that person knew about the gun threats in terms of the timing here? I don't believe there is anything in the record one way or the other on that, Judge King. And that was Sergeant Byrd that was Trooper Mullinex's immediate supervisor. And did he, in fact, back off of that later on and said, if I'd known everything I wouldn't have said that? Only when we took his deposition after a lawsuit was filed, he did. But if Leha had stopped before he got to Cemetery Road, for example, claiming having those threats that had already been made, Trooper Rodriguez would have stopped behind him and he would have deployed felony stop, high-risk felony stop practices, which would have been prudent. He was taught and trained how to deal with that. They would not have immediately opened fire on the vehicle because we've got someone inside who may or may not have a gun. They've said that they have a gun. And that brings us to the case of Sanchez v. Fraley. And that was highlighted there. In the Sanchez case, there was a, the officer had received a communication from his dispatch that the individual might be armed or might have a gun. And so the officer had that specific communication. But in Sanchez, the court said no, the officer was not entitled to qualified immunity because he did not have probable cause to believe that the suspect was employing a gun against him at that moment, that moment of the threat. And that's what we have to look at. All of these cases distill down to what the subject was doing at the moment of the use of deadly force. Two cases recently decided by the court affirm that on both sides of the issue. The Reyes v. Bridgewater case from January of 2010. And that was a case involving a knife. And I believe Judge King, Judge Haynes, you guys heard that case. It was a case where there was no qualified immunity for the officer because the knife was just held in the hand while the gentleman had a cigarette and flicked the cigarette down. There was a factual dispute about whether it was aggressively or not. But there was no immediate threat to the officer from the knife. On the other side of the issue, just this past March, Harris v. Serpis came down that said where an individual is holding a knife up high in a manner to stab a police officer, that yes, that's a situation where deadly force is appropriate. And that's how we divide this issue based on the immediacy of the threat and the inherent danger involved. But is Plowhoff a game changer on all of this? Does it kind of wipe out all of our cases on that and say, you know, it didn't seem like they were quite as focused on, like, where the knife was positioned. And a knife is a little different from a moving vehicle as far as its threat. I realize, I mean, I don't want to be anywhere with somebody holding a knife. I get that. But, you know, down here you still have plenty of time to draw your weapon by the time the guy can strike with the knife. You've got this car zooming down the freeway that's gone everywhere from 80 to 100 miles an hour with a guy making threats and whatever. And the whole setup, it's a little different. You know, the immediacy, I realize, is what Lytle's turned on, or Lytle or whatever, but it doesn't seem like Plowhoff is as obsessed with that. And I don't think Plowhoff is a game changer. I think that Plowhoff is clearly predictable. If we go back and look at Brousseau and we look at the cases that existed in 2004, I think that Plowhoff reached the right conclusion. I don't think it does change the law because in Plowhoff the facts were different than the facts we have in this case. In Plowhoff, there was assaulted behavior of the subject. The subject had attempted to ram police officers. He was, at the time of the shooting, he had his foot down on the accelerator, mashing on the gas, spinning the tires, trying to back up and get out of the way, and there were pedestrian officers that were trying to get him out of the vehicle. They had tried a rolling roadblock. That's one of the other factors that some of these cases say should be examined, is what other attempts have been made. The rolling roadblock failed. There were three collisions with police officers, which we didn't have here. It has come down to, in all of these cases, Supreme Court cases, you're talking about immediate high risk, either to the officers or to the people around them, civilians. That's right. The district judge here, and I realize that we don't evaluate her conclusion. We look at the record. The district court here said there was a question, based on the evidence that she thought was in the record on behalf of the plaintiff, about that fact, whether this was a high risk situation at the time of this gun was fired. And the district court found that it was . . . Risk is a question of fact. Right. And the district court was not comfortable with the conclusiveness of those facts to rule in favor of Trooper Mullinex and said those are fact issues that should be considered by the jury and that Officer Mullinex was not entitled to qualified immunity as a matter of law because of the extreme lightness, the absence of the risk. Does it make any sense to vacate this judgment and send it back for consideration under Plumhoff in the first instance? I don't believe it does, Judge Haynes, because I don't think the court's conclusion would be any different and because I think Plumhoff was decided based on the earlier case law. And a careful reading of Plumhoff shows this same line of thinking, based on the facts of Plumhoff, that there was an extreme risk to pedestrians, to people in the residential area in Plumhoff, that just is not present in this case. And I would encourage the court, if it hasn't already done so, to watch the videos. Watch Trooper Rodriguez's dash cam and the court can see that during this 18 miles, 21 minutes of pursuit, there were only eight cars that were passed. And in each of those eight instances, J.R. Leha slowed down and pulled around into the passing lane and passed the cars. I don't know that he used his signal, but everything else he did was consistent with simply driving at a higher rate of speed on the interstate. Leha never drove toward any police officer in a threatening manner. He never brandished a firearm. There was nothing to indicate an immediate risk to anybody that would have been a pedestrian or another officer. And the very importance of requiring that immediate risk is something that is going to be more important in the future because of the fact that so many police departments are employing drones now to patrol highways and employing aerial techniques. We saw just last year a case where the DPS had a sniper in the valley that shot two Guatemalan nationals that were fleeing, shot them from a helicopter, and they were fleeing on a highway down below. Okay. Thank you very much. Airplanes or drones, and each case is, this court and other courts have said that these cases are very fact-specific and they're based on the facts of that particular case. And what has happened in other cases, we don't have the facts in those cases to assess those to be able to try to apply those to this case. So focusing on what the court had asked earlier about what evidence there was in the record as to what the sergeant said and what he knew, and I would direct your attention to page 12. Footnote 11 cites two pages in the record. The officer on this, where it says, the sergeant's response was a suggestion and not an order. When he gave that suggestion, he thought that Trooper Mullenix was behind the suspect chasing him. Had the sergeant known all the details, he would have told Trooper Mullenix to make that decision because he was the officer on the scene and the sergeant had limited information. And it cites to Record on Appeal 974 to 976, and that's a testimony of the sergeant. But what about Judge Graves' point that we have a lot of officers on the scene and everybody else was content to do the putting the spikes out and all of that, and this guy who was not in charge just decided on his own to start shooting? Well, each officer has to assess the situation based upon what he sees and knows, and like I said before, the other officers had put out the spikes early on, made that decision before the suspect called in and started making these threats, and that's what changed the situation, and the officer knew that. But, counsel, frankly, the only thing that changed the situation was there happened to be a bridge, which was someplace where he could perch and he had a rifle in the trunk and he could take a shot at the cup. And I guess what I'm getting at is all of these cases that we're talking about, and I think counsel opposite may have mentioned surface where the decedent in that case raised the knife. The officers were in the room, and it was on video, by the way, so you could actually see what the officers did, and the determination in that case was that the officer acted reasonably under the circumstances in the moment. And all I'm suggesting is in this one, the only reason this is a moment is because there was a bridge and a rifle. I mean, all I'm... Your Honor, I would respectfully disagree. I have an officer here who knows that this guy wants to shoot police officers. He has a duty to protect citizens and police officers. So two moments later, your suggestion would have made all the difference in the world. This result had to happen in this moment given this imminent danger, and the only imminence was he was coming down the interstate where apparently, I guess, most of the people in west Texas drive 80 miles an hour. But he's coming down the interstate going 80 miles an hour, and it's imminent because I got a bridge and a rifle. No, your Honor. Why is that an imminent moment? Because when someone says they have a gun in this day and age, the officer needs to believe that that's a possibility, and the standard that these officers are held to, and as this judge... Well, the cases say that it's not actual harm. It's based upon the probable cause standard. He just has reason to believe. Just like in the Killeen case where the officer surrounded the car, and the suspect is sitting there, and he leans down. The officers didn't know if he had a gun or not, but because of his body language, they had to believe that he was reaching for a gun and was going to shoot him, and they didn't have a gun in that case, and the court said that doesn't matter. All they have to have is probable cause to believe that there was a danger. What this officer is faced with, if Leha did have a gun, and he did want to shoot police officers, and Mullinex just stands there, and Leha drives by and shoots Ducheneau... I'll wait, but maybe you just said something different, but we have a lot of police officers involved in this case, lots of them, and they're all operating on the principle that the sergeant was nagged. You say, well, the sergeant has corrected the record, but at the time, the sergeant said, let's just wait and see if the spikes work, so we have a lot of...we've got a vote here of police officers, and so then we have one police officer who takes it upon himself, apparently with authority. Maybe it had been countermanded, but, I mean, apparently an individual police officer can take it upon himself. That was not the case in these other cases. The other cases, it was clearly high risk, and all the police officers were of the same mind. Okay, that's not what happened here. We've got a vote here. We've got a number of police officers who say, let's just let this thing play out, and then we have the defendant here saying, no, no, I'm empowered to act here, and I'm going to go ahead and shoot. That's a different...it may be the same result, okay, but it's a different fact pattern than the one in these cases. May I conclude, Your Honor? Yes. The issue in this case is whether there was clearly established law prohibiting Trooper Mullenix's conduct and whether there was any clearly established law that would have put him on notice that this was a violation of the law. And based upon Brousseau and Plumhoff, there's nothing out there that controverses or that would put any officer on notice that deadly force was unconstitutional in this situation. The opposing counsel talked about Lytle and Sanchez. Both those cases, there was a fact dispute in those cases. Okay. Thank you. We appreciate both sides' arguments. And the matter is submitted.